**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ROMAN CATHOLIC ARCHDIOCESE OF NEWARK, et al., | : : : : | |
| Plaintiffs, | : : | Civil Action No. 15-5647 (MAS) (LHG) |
| v. | : : : | **MEMORANDUM OPINION** |
| CHRISTOPHER CHRISTIE, in his official capacity as Governor of New Jersey, et al., | : : : | |
| Defendants. | : : : | |

**SHIPP, District Judge**

Plaintiffs Roman Catholic Archdiocese of Newark ("Archdiocese"), Emilio Mazza, and Dennis Flynn, Sr. (collectively, "Plaintiffs") challenge the constitutionality of Assembly Bill 3540, codified at N.J. Stat. Ann. § 16:1-7.1 (2015), a New Jersey statute that, among other things, prohibits private religious cemeteries, including the Archdiocese, from selling or owning headstones, vaults, and monuments ("Statute"). Plaintiffs assert that the Statute violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment[1] and, accordingly, seek a declaration that the Statute is unconstitutional and to permanently enjoin Christopher Christie, in his official capacity as then-Governor of New Jersey, and John Jay Hoffman, in his official capacity as then-Attorney General of New Jersey ("State Defendants") from enforcing the Statute.

---

[1] The Court, in its previous ruling on Defendants' motion to dismiss (ECF No. 24), dismissed Plaintiffs' Privileges and Immunities and Contracts Clause claims. (ECF No. 33.) Accordingly, only Plaintiffs' Equal Protection and Due Process Clause claims remain.

This matter comes before the Court on two motions: State Defendants and Intervenor Defendant New Jersey State Funeral Directors Association, Inc.'s[2] ("NJSFDA" and collectively with the State Defendants, "Defendants") joint motion for summary judgment (ECF No. 66) and Plaintiffs' motion for summary judgment (ECF No. 67). Both Plaintiffs and Defendants filed opposition to their adversaries' motion (ECF Nos. 68, 69) and replied (ECF Nos. 70, 71). The Court has carefully considered the parties' submissions and held oral argument on December 6, 2017. For the reasons stated below, Plaintiffs' motion for summary judgment is DENIED and Defendants' joint motion for summary judgment is GRANTED.

# I. BACKGROUND[3]

## A. Overview of the Archdiocese's Burial Options

The Archdiocese is a non-profit, religious entity that is an "administrative jurisdiction of the Roman Catholic Church, with 214 parishes in Bergen, Union, Hudson, and Essex counties"

---

[2] NJSFDA is an association of about "500 New Jersey funeral homes and 1,000 New Jersey licensed funeral directors, who employ approximately 2,200 individuals." (Defendants' Joint Statement of Undisputed Material Facts ("Defs.' JSUMF") ¶ 112, ECF No. 66-2.) "The NJSFDA represents the significant majority of the occupation's economic interests as represented in the funeral homes owned by its members, and provides advocacy, information, education, and business support services." (Id.)

[3] For efficiency, the Court omits separate citations to Plaintiffs' Response to Defendants' Statement of Uncontroverted Material Facts (("Pls. Resp. to Defs.' JSUMF"), ECF No. 68-1) where Plaintiffs clearly admit to a fact contained in Defs.' JSUMF. Similarly, the Court omits separate citations to Defendants' Joint Objections and Response to Plaintiffs' Statement of Material Facts Not in Dispute (("Defs.' JOAR to Pls.' SMFND"), ECF No. 69-1) where Defendants clearly admit to a fact contained in Plaintiffs' Statement of Material Facts Not in Dispute (("Pls.' SMFND"), ECF No. 67-1). The Court further omits duplicative citations to both parties' statements of facts where the parties allege identical facts.

The Court also notes that Defs.' JOAR to Pls.' SMFND fails to specifically identify what aspects of Plaintiffs' purported facts are disputed with respect to a number of Plaintiffs' alleged facts. Nevertheless, the Court has performed a searching review of the record in an effort to glean an understanding of Defendants' objections.

(Pls.' SMFND ¶¶ 1, 2.) Catholic Cemeteries, a division of the Archdiocese ("Catholic Cemeteries") operates the Archdiocese's eleven private cemeteries in northern New Jersey for the use of its parishioners and families only, with rare exceptions.[4] (Id. ¶¶ 6, 7; Defs.' JSUMF ¶ 27.) In addition to being a place for burial of the dead, cemeteries are "an integral part of the Archdiocese's effort to evangelize the life, death, and resurrection of Jesus Christ[;]" "the cemeteries host masses within the various cemetery chapels and informal worship by those who work at and visit the cemeteries." (Pls.' SMFND ¶ 16.)

There are four options for interment or entombment in the Archdiocese's cemeteries: "(1) traditional in-ground burial; (2) entombment in a community mausoleum; (3) entombment in a private mausoleum; and (4) interment or entombment of cremated remains in a columbarium, crypt, or grave." (Id. ¶¶ 18, 19.) Those who wish to be buried in the ground must purchase a right of interment and excavation and burial services. (Id. ¶ 20.) In connection with these types of burials, a monument memorializing the decedent, typically made out of granite or marble, may be purchased. (Id. ¶¶ 22-24.) Additionally, remains that have not been cremated are typically placed inside a casket, which is, in turn, laid to rest inside of a plastic container, called a vault, within a grave in the ground. (Id. ¶¶ 30-32.) Remains may instead be placed inside of one of the interment spaces in a community mausoleum. (Id. ¶ 38.) Community mausoleums are large buildings that contain thousands of crypt spaces, covered by marble or granite covers that form the interior walls, as well as stained glass, liturgical artwork, sculptures, and chapels.[5] (Defs.' JSUMF ¶ 8 n.1.)

---

[4] Some Coptic Christians are also allowed to be buried in the Archdiocese's cemeteries. (Pls.' SMFND ¶ 8.)

[5] Plaintiffs dispute the portion of Defendants' statement that suggests the Archdiocese operates a "public mausoleum" as defined by law. Plaintiffs, however, do not address the footnote that describes the structure of a community mausoleum. The Court, therefore, deems the description undisputed.

Alternatively, parishioners may purchase the right to build a private family mausoleum, a stone building that can hold the remains of multiple family members. (Pls.' SMFND ¶¶ 42-44.)

## B. The Inscription Rights Program

According to the Archdiocese, it instituted the inscription rights program ("IRP") because of its responsibility to maintain its cemeteries in the face of various obstacles—the cost, coupled with the fact that it does not own the monuments on its property, which may become damaged and worn down over time. (*See generally* Compl. ¶¶ 101-12, ECF No. 1.) Accordingly, in 2006, the Archdiocese began selling private mausoleums, "structured as a sale of burial rights in the mausoleum and perpetual care of the structure." (Defs.' JSUMF ¶ 33.) In 2013, the Archdiocese expanded its sales efforts when it commenced the sale of monuments, "structured . . . as a sale of a right to the memorial inscription on a monument and perpetual care of the stone." (*Id.* ¶¶ 38, 42.) Under the IRP, the Archdiocese provided the monument or private family mausoleum, retained its ownership, and was responsible for the monument's upkeep in perpetuity. (Pls.' SMFND ¶¶ 56-58.) The Archdiocese directly competed against independent monument builders for sales and anticipated that the IRP would decrease monument sales made by these businesses. (Defs.' JSUMF ¶¶ 40, 98.)

Andrew Schafer, the Executive Director of Catholic Cemeteries and a skilled veteran salesman, oversaw the sales program (including the IRP), mausoleum construction, cemetery operations, and training. (*Id.* ¶¶ 44, 45, 47.) "The Archdiocese has a highly trained, well-compensated, and successful salesforce consisting of a Director of Sales, two Sales Managers, two Senior Counselors, and eighteen Sales Advisors." (*Id.* ¶ 46.) Total or partial commission-based compensation, incentive programs, sales goals, and sales contests incentivize the sales team. (*Id.* ¶¶ 57-61.)

Plaintiff Mazza purchased a private mausoleum, where his wife is laid to rest and where he will also be interred.[6] (Pls.' SMFND ¶ 45.) Plaintiff Flynn buried his son in an Archdiocesan cemetery and purchased a monument through the Church. (Defs.' JSUMF ¶¶ 82, 86, 95.) Both "Plaintiffs Mazza and Flynn feel deep reassurance that their monuments will be cared for in perpetuity and that the money they spent supported the church and cemeteries." (Pls.' SMFND ¶ 71.)

## C. Industry Response: State Court Action and Passage of the Statute

The Monument Builders of New Jersey, Inc. ("MBNJ"), is a trade association of "New Jersey monument dealers, suppliers and installers and letter cutters." (Defs.' JSUMF ¶ 104.) Its president, John Burns, owner of both Burns Brothers, "a wholesale monument manufacturer," and "Albert H. Hopper Monument Company, a retail monument dealer", has lead MBNJ since approximately 2006. (*Id.* ¶¶ 105, 106). Mr. Burns met twice with Mr. Schafer to discuss the IRP, in an attempt to dissuade the Archdiocese from entering the mausoleum and monument markets; however, Mr. Burns's efforts were unsuccessful. (*Id.* ¶¶ 107-09.) Mr. Schafer told Mr. Burns that the Archdiocese did not believe it was legally prohibited from launching the IRP. (*Id.* ¶ 109.)

In August 2013, MBNJ instituted litigation in New Jersey state court against the Archdiocese seeking to enjoin its sale of monuments and private mausoleums. (*Id.* ¶ 110.) During the litigation, Wilson Beebe, then-Executive Director of the NJSFDA, served as an expert witness for MBNJ, having "broad generalist knowledge of the funeral and cemetery industry that would contribute to the trial." (*Id.* ¶ 111.) On April 29, 2014, the court held that the provisions of N.J. Stat. Ann. § 45:27-16—including the ban on a cemetery company's manufacture or sale of

---

[6] Defendants dispute Plaintiffs' characterization of the mausoleum as a "family mausoleum" instead of a "private mausoleum." (*See* Defs.' JOAR to Pls.' SMFND ¶ 45.)

memorials, private mausoleums, or vaults and operation of funeral homes[7]—did not apply to the Archdiocese, and, therefore, the Archdiocese could continue to sell private mausoleums and monuments. (*Id.* ¶ 113.) On June 23, 2015, the New Jersey Appellate Division affirmed the lower court decision. (Pls.' SMFND ¶ 82.)

After their lawsuit failed, MBNJ and NJSFDA commenced an initiative to draft and to lobby the New Jersey State Legislature ("Legislature") to pass the bill that would eventually be enacted into law as the Statute. (Defs.' JSUMF ¶ 126.) After NJSFDA composed the first draft of the bill, NJSFDA and MBNJ contacted various state legislators and circulated the bill to leaders in both the General Assembly and the Senate. (*Id.* ¶¶ 129-30.) Assemblyman Giblin, the Chair of the Assembly Regulated Professions Committee, and Senator Sweeney, the president of the New Jersey Senate, agreed to sponsor the bill in their respective chambers. (*Id.* ¶ 133.) NJSFDA and MBNJ, on one side, and the Archdiocese on the other, vigorously lobbied for and against passage of the bill. For example, both sides engaged the services of lobbyists and communication

---

[7] This statute provides, in pertinent part:

> A cemetery company, and any person engaged in the management, operation or control of a cemetery owned by a cemetery company, directly or indirectly, is specifically prohibited from engaging, directly or indirectly, in any of the following activities:
>
> (1)   the manufacture or sale of memorials;
> (2)   the manufacture or sale of private mausoleums;
> (3)   the manufacture or sale of vaults, including vaults installed in a grave before or after sale and including vaults joined with each other in the ground; and
> (4)   the conduct of any funeral home or the business or profession of mortuary science; provided that crematoriums operated in conjunction with funeral homes prior to December 1, 1971 are excepted from the provisions of this paragraph (4).

N.J. Stat. Ann. § 45:27-16

professionals. (*Id.* ¶¶ 131, 138.) In addition, NJSFDA and MBNJ submitted written position statements to both houses of the Legislature. (*Id.* ¶ 132.) The Archdiocese communicated its opposition to every state legislator, through an "op ed" by the Archbishop published in a Catholic publication, via a personal phone call from the Archbishop to Assemblyman Giblin, and two e-mail communications to parish priests and to parish priests and staff urging them to voice their opposition to legislators and to tell their congregations to do the same. (*Id.* ¶¶ 140-45.)

The Senate and Assembly versions of the bill, S2485 and A3840, were introduced on October 14 and October 23, 2014, respectively, with bipartisan support. (*Id.* ¶¶ 134-35.) "A3840 was referred to the Assembly Regulated Professions Committee, which held a public hearing on October 23, 2014", and "S2485 was reported out to the Senate Commerce Committee, which held a public hearing on December 8, 2014." (*Id.* ¶¶ 146, 152.) During both hearings, NJSFDA, MBNJ, monument manufacturers, sellers, and/or engravers, the Archdiocese, and the New Jersey Cemetery Association provided testimony. (*Id.* ¶¶ 147, 149, 153, 155.) On December 18, 2014, the full Assembly passed A3840 by a vote of sixty-three to ten, with three abstaining, and the full Senate passed S2485 by a vote of twenty-seven to four. (*Id.* ¶¶ 173-74.) Then-Governor Christopher Christie exercised a conditional veto on February 5, 2015. (*Id.* ¶ 183.) Governor Christie did not object to the substance of the Statute, but took issue with the Statute's immediate effective date and its impact upon those who planned to participate in the IRP. (*Id.* ¶¶ 184-85.)

The Assembly amended A3840 and revised its effective date to a year from the date of enactment. (*Id.* ¶ 186.) On March 9, 2015, the Assembly passed amended A3840 with sixty-eight congresspeople in favor, seven against, and one abstention. (*Id.* ¶ 187.) On March 16, 2015, the Senate passed amended A3840 by a vote of thirty-one in favor to two against. (*Id.* ¶ 188.) On

March 23, 2015, upon the Governor's signature, the bill became law and the Statute went into effect as of March 23, 2016. (*Id.* ¶¶ 189-90.)

The Statute provides:

Notwithstanding the provisions of any other law, rule or regulation to the contrary, a religious corporation, association, organization or society, however formed or incorporated, that owns or controls a cemetery or that engages in the management, operation or sales of or for a cemetery, whether directly or indirectly, or the owner or operator of a religious cemetery, is prohibited from engaging, directly or indirectly, in:

> (1) the ownership, manufacture, installation, sale, creation, inscription, provision or conveyance, in any form, of memorials;

> (2) the ownership, manufacture, installation, sale, creation, provision or conveyance, in any form, of vaults, including vaults installed in a grave before or after sale and including vaults joined with each other in the ground;

> (3) provision or conveyance, in any form, of a mausoleum intended for private use, which shall not include a mausoleum built for use by or sale to the general public membership of a religious organization;

> (4) the ownership or conduct of any funeral home or mortuary, or the engaging in the business or profession of funeral directing or mortuary science;

> (5) the sale, renting or leasing of any of its real property dedicated to cemetery purposes, for the location of a funeral home or mortuary or the conduct of the business or profession of funeral directing or mortuary science; or

> (6) the entering into a management contract to authorize control of its cemetery related operations with any entity that, directly or indirectly, in this State, engages in the ownership or conduct of a funeral home or mortuary or that engages in the business or profession of funeral directing or mortuary science.

N.J. Stat. Ann. § 16:1-7.1.[8]

---

[8] Plaintiffs' factual disputes seek to demonstrate that the assumptions underlying Defendants' justification for the Statute are implausible and unconstitutional. (Pls.' Opp'n Br. 23.) Their disputes fall into four categories (*id.* at 23-31): (i) historically, the extent of New Jersey's regulation of religious cemeteries and monument sales and the existence of the separation of

Plaintiffs allege that the Statute violates Plaintiffs' right to due process of law on its face and as applied because it prohibits "religious corporations from selling vaults or monuments such as headstones and private family mausoleums, to parishioners" and the Archdiocese should be free to pursue any occupation of its choosing. (Compl. ¶ 228.) Plaintiffs further assert that the Statute violates Plaintiffs' right to equal protection under the law on its face and as applied because "[t]here is no rational basis for forbidding the Archdiocese from selling a traditional monument such as a headstone while allowing the Archdiocese to sell memorializing covers or plaques for its community mausoleums." (*Id.* ¶ 234.) Instead, Plaintiffs assert that the distinction only serves to protect the "financial interests of headstone dealers." (*Id.*)

## II.  LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is appropriate if the record demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A material fact—a fact "that might affect the outcome of the suit under the governing law" *Anderson*, 477 U.S. at 248—raises a "genuine" dispute if "a reasonable jury could return a verdict for the non-moving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 250). To determine whether a genuine dispute of material fact exists, the Court must

---

industries law (*see, e.g.*, Defs.' JSUMF ¶¶ 9-13, 15; Pls.' Resp. to Defs.' JSUMF ¶¶ 9-13, 15); (ii) the IRP's potential effect on the monument market (*see, e.g.*, Defs.' JSUMF ¶¶ 28, 119, 120, 169, 170, 178; Pls.' Resp. to Defs.' JSUMF ¶¶ 28, 119, 120, 169, 170, 178); (iii) the nature of Archdiocese's salesforce and marketing tactics, which Defendants describe as predatory (*see, e.g.*, Defs.' JSUMF ¶¶ 49, 54, 62, 65-68, 71, 72, 74, 75, 80; Pls.' Resp. to Defs.' JSUMF ¶¶ 49, 54, 62, 65-68, 71, 72, 74, 75, 80); and (iv) whether Plaintiff Flynn made an informed purchase or was blinded by his faith (*see, e.g.*, Defs.' JSUMF ¶¶ 91, 97; Pls.' Resp. to Defs.' JSUMF ¶¶ 91, 97). Plaintiffs argue in the alternative that a trial is warranted to resolve the parties' disagreements about the record. (*Id.* at 22.) The Court, however, does not deem these facts material to its analysis.

consider all facts and reasonable inferences in a light most favorable to the non-movant. *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). The Court will not "weigh the evidence and determine the truth of the matter" but will determine whether a genuine dispute necessitates a trial. *Anderson*, 477 U.S. at 249.

The party moving for summary judgment has the initial burden of proving an absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Thereafter, the nonmoving party creates a genuine [dispute] of material fact if sufficient evidence is provided to allow a jury to find for him at trial. *Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 138 (3d Cir. 2001).

"When ruling on cross-motions[9] for summary judgment, the court must consider the motions independently . . . and view the evidence on each motion in the light most favorable to the party opposing the motion." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp. 2d 463, 468-69 (D.N.J. 2002) (internal citations omitted). The denial of one cross-motion "does not imply that the other must be granted." *Ill. Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 85 F. Supp. 3d 785, 794 (D.N.J. 2015); *accord F.A.R. Liquidating Corp. v. Brownell*, 209 F.2d 375, 380 (3d Cir. 1954).

### B.  Due Process and Equal Protection Clause Claims

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. If the challenged statute does not implicate "certain fundamental rights and liberty interests," courts apply the rational basis standard of review to determine whether the statute passes

---

[9] Although the parties' papers are not captioned as cross-motions, the treatment of these motions is essentially the same.

constitutional muster.[10] *Heffner v. Murphy*, 745 F.3d 56, 79 (3d Cir. 2014) (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *Roe v. Wade*, 410 U.S. 113, 173 (1973)). Challengers of a statute "must convince the court that the legislative facts on which the classification [or statute] is apparently based could not reasonably be conceived as true by the governmental decisionmaker." *Sammon v. N.J. Bd. of Med. Exam'rs*, 66 F.3d 639, 645-46 (3d Cir. 1995) (quoting *Vance v. Bradley*, 440 U.S. 93, 111 (1979)) (alteration in original) (quotations omitted). Rational basis review constrains a court to uphold a statute subject to "'a substantive due process challenge if the state identifies a legitimate state interest that the legislature could rationally conclude was served by the statute.'" *Heffner*, 745 F.3d at 79 (quoting *Alexander v. Whitman*, 114 F.3d 1392, 1403 (3d Cir. 1997)). This standard, however, is not "toothless"—"'there will be situations where proffered reasons are not rational.'" *Heffner*, 745 F.3d at 79 (quoting *Doe v. Pa. Bd. of Prob. & Parole*, 513 F.3d 95, 112 n.9 (3d Cir. 2009)).

The Equal Protection Clause of the Fourteenth Amendment states that that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Given that neither membership in a suspect class nor a fundamental right is implicated here, the analysis of Plaintiffs' Equal Protection claim proceeds in essentially the same manner as the Due Process analysis, *i.e.*, whether "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Barr v. Capouillez*, 602 F. App'x 44, 49 (3d Cir. 2015) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). The Equal Protection Clause "does not forbid all classifications" but instead prevents "governmental decisionmakers

---

[10] The parties do not dispute that the Statute is subject to rational basis review and not any form of heightened scrutiny. (Defs.' Moving Br. 14 n.10, ECF No. 66-1; Pls.' Moving Br. 17, 67-2.)

11

from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

## III. DISCUSSION

### A. Overview of the Parties' Arguments

#### 1. Defendants' Argument

Defendants argue that the Statute comports with both the Due Process and Equal Protection Clauses. As a threshold matter, Defendants argue that the Court need not resolve any issues of fact when it reviews a statute and applies the rational basis standard. (Defs.' Moving Br. 13.) According to Defendants, the Statute is rationally related to "plausible and legitimate" state interests, six of which are outlined in their briefing:

> (1) promoting the uniformity of New Jersey's separation of industries law by applying the commercial activity restrictions first applied to secular cemeteries to include religious cemeteries; (2) regulating tax-exempt entities; (3) protecting consumers; (4) promoting fair markets and competition; (5) preserving local jobs; and (6) protecting certain intrastate economic interests.

(*Id*. at 18.) Defendants assert that these interests were not only plausible, but also actually considered by the Legislature. (*Id*. at 19.)

With regard to the Equal Protection claim, Defendants assert that Plaintiffs' proffered classification—that the Archdiocese is barred from dealing in monuments, vaults, and mausoleums but may sell covers and plaques for community mausoleum spaces—cannot give rise to an Equal Protection claim and, assuming *arguendo* it can, the classification is rationally related to the previously discussed state interests. (*Id*. at 36.) Defendants assert that these goods are, in fact, different and that the Court must defer to the Legislature's determination of their difference. (*Id*.) Further, assuming *arguendo* that the "cemetery goods at issue have some functional equivalence," Defendants assert Plaintiffs' claim still fails. (*Id*. at 38.) Defendants argue that the Legislature

can treat functionally equivalent items differently, provided that the difference in treatment is rationally related to a legitimate state interest. (*Id.*)

Finally, Defendants argue that the Legislature enacted the Statute because it rationally may have and actually did believe that the Statute furthered the interests discussed below. (*Id.* at 35.) Defendants assert that:

> [t]he Legislature's concerns about [all] cemeteries . . . exploiting their natural psychological and economic advantages are well-documented in the development of New Jersey cemetery law and in the Statute's legislative history. Moreover, the conditions that had always been recognized as ripe for abuse were again realized when the Archdiocese decided to enter into the monument business. The Statute is rationally related to these long-recognized, legitimate competition and consumer protection concerns because it prohibits income and property tax-exempt cemeteries from exploiting those advantages to the detriment of competitors who lack those advantages.

(*Id.*)

### 2. Plaintiffs' Argument

Plaintiffs first frame rational basis review as a meaningful standard and not the equivalent of a judicial "rubberstamp" on legislative action.[11] (Pls.' Moving Br. 17-18.) Next, Plaintiffs contend that they can negate every plausible rationale for the Statute and that the Statute is "surgically" and "narrowly" tailored to its true purpose—illegitimate "private economic

---

[11] At oral argument, Plaintiffs highlighted *Doe v. Pennsylvania Probation and Parole* as a case in which the Third Circuit upheld the district court's invalidation of the law on Equal Protection grounds when applying rational basis review. *Doe*, 513 F.3d at 107. The law at issue required that: (i) a sex offender register with local law enforcement; and (ii) the community be notified of his presence. *Id.* at 101. The plaintiff in *Doe* challenged the law's community notification provision as applied to out-of-state offenders—the community notification provisions applied to in-state sex offenders adjudicated to be "sexually violent predators" and all out-of-state offenders, regardless of offense and without adjudication. *Id.* The Court finds the facts of *Doe*, which involved disparate treatment of sex offenders based on geographic origin, to be distinguishable from this case, involving monuments and vaults, on one hand, and crypts and plaques on the other. Moreover, the classification at issue was not rationally related to protecting the community from violent offenders; however, in this case, the Statute is rationally related to the state interests discussed below.

protectionism".[12] (*Id.* at 21, 22, 24.) Plaintiffs acknowledge that there is a split among the circuits as to whether private economic protectionism is a legitimate state interest. (*Id.* at 21.) The Second and Tenth Circuits have held that economic protectionism is a legitimate state interest, while the Fifth, Sixth, and Ninth Circuits have held that it is not. (*Id.*) Plaintiffs concede that their claims fail if this Court finds that the interest is, in fact, legitimate. (*Id.* at 20).

## B.    Analysis

In order for a plaintiff to prevail on a facial challenge to a statute, it "'must establish that no set of circumstances exists under which the [statute] would be valid.'" *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "An as-applied attack . . . does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010).

The parties concede that the Court must assess the Statute's constitutionality by applying rational basis review.  (Defs.' Moving Br. 14 n.10; Pls.' Moving Br. 17.)  "[T]he rationality requirement [is] largely equivalent to a strong presumption of constitutionality." *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 213 (3d Cir. 2013)). "[R]ational basis review allows legislative choices considerable latitude." *Heffner*, 745 F.3d at 79 (citing *Beach Commc'ns*, 508 U.S. at 315). "A governmental interest that is asserted to defend against a substantive due process challenge need only be *plausible* to pass constitutional muster; we do not second-guess legislative choices or inquire into whether the stated motive actually motivated the legislation." *Heffner*, 745 F.3d at

---

[12] Plaintiffs contend that pursuant to *Metropolitan Life Insurance v. Ward*, 470 U.S. 869 (1985), economic protectionism is not a legitimate government interest. (Pls.' Moving Br. 22.) Defendants contend that this decision was severely limited to its facts by later Supreme Court precedent. (Defs.' Opp'n Br. 26, ECF No. 69.)

79 (citing *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)) (emphasis added). "[L]egislative choice . . . may be based on rational speculation unsupported by evidence or empirical data." *Am. Express Travel Related Servs. v. Sidamon-Eristoff*, 669 F.3d 359, 367 (3d Cir. 2012) (citing *Beach Commc'ns*, 508 U.S. at 315). Courts cannot "second guess the legislature on the factual assumptions or policy considerations underlying the statute. If the legislature has assumed . . . that [the statute] will serve the desired goal, the court is not authorized to determine . . . whether the desired goal has[, in fact,] been served." *Sammon*, 66 F.3d at 645. The question, instead, is "whether the legislature rationally might have believed . . . the desired end would be served." *Scavone v. Pa. State Police*, 501 F. App'x 179, 181 (3d Cir. 2012). "If the legislative determination that its action will tend to serve a legitimate public purpose is '*at least debatable*', the challenge to that action must fail as a matter of law." *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 238 (3d Cir. 1987) (quoting *United States v. Carolene Prod. Co.*, 304 U.S. 144, 154 (1938)) (emphasis added).

For the purposes of the Court's analysis, the Legislature need not have actually considered Defendants' asserted state interests in order for the Statute to stand. *See Beach Commc'ns*, 508 U.S. at 315 (noting that "whether the conceived reason for the challenged distinction actually motivated the legislature" is not germane to the constitutional analysis). In this case, the record reflects that the Legislature carefully deliberated the arguments for and against the challenged Statute. *Heffner*, 745 F.3d at 79 (citing *Fritz*, 449 U.S. at 179). In addition to the testimony and statements included below, congresspeople made remarks that indicated the same:

> Senator Kean: We had extraordinary and compelling testimony on both sides of – this issue.

> Senator Cardinale: This is probably one of the more troubling issues I've had to deal with on this Committee in a lot of years. I came at it initially trying to put myself in the shoes of some people who are being affected. And I met with the

15

various parties. And there are very strong arguments on all sides of the question.

Senator Lesniak: Thank you, Madam Chair, and thank you all for your testimony. I've wrestled with this as . . . Senator Cardinale has.

Assemblyman Moriarty: Because you know, Chairman, I look at this bill, this kind of legislation comes before us so often where we have to mediate, arbitrate between different organizations.

Assemblyman Ciattarelli: . . . I applaud you for bringing a bill before us that caused us serious deliberation and discussion. . . [.]

(Defs.' JSUMF ¶ 172.) The Court considers three of Defendants' proffered state interests in turn.[13]

## 1. Uniformity of Separation of Industries Law

Defendants assert that New Jersey has a legitimate interest in uniformity of legislation and extending its longstanding "separation of industries law" to religious cemeteries. (Defs.' Moving Br. 19.) Defendants claim that a body of state court case law arose in response to concerns like exploitation of tax exemptions, unfair competition, and consumer manipulation in the cemetery industry. (*Id.* at 20.) Moreover, Defendants assert that the New Jersey Supreme Court explicitly recognized "consumer protection and competition concerns implicated by the potential of cemeteries to monopolize and manipulate the cemetery and funeral industries." (*Id.* at 21.) In 1971, the Legislature prohibited the sale of monuments, vaults and private mausoleums by non-religious cemeteries; the law was recodified in the New Jersey Cemetery Act of 2003. (*Id.*) Defendants argue that at the time of the recodification, the Legislature had no need to extend and to apply the ban to religious cemeteries because no religious cemetery had currently entered the market. (*Id.* at 22.) After the Archdiocese began selling private mausoleums and monuments, however, the Legislature responded and passed the Statute with "overwhelming support." (*Id.*)

---

[13] Because the Court has found that three of the purported state interests are legitimate, it need not consider the remainder of Defendants' proffered interests or Plaintiffs' position that economic protectionism is a legitimate state interest.

Moreover, Defendants cite the statement of then-Governor Christopher Christie to describe the legislative action: "Under current law, cemetery companies are prohibited from engaging in the manufacture of memorials, private mausoleums and vaults. The law specifically exempts religious cemeteries from the definition of 'cemetery company.' This bill eliminates that exemption." (*Id.* at 23.) In addition, Defendants note that the Second Circuit affirmed a district court's determination that New York State's separation of industries law withstood constitutional challenges on Due Process and Equal Protection grounds, and that law was rationally related to similar interests as the Legislature considered in this case. (Defs.' Reply Br. 13, ECF No. 71 (citing *N.Y. State Ass'n of Cemeteries, Inc. v. Fishman*, No. 1:99-cv-00664, 2004 U.S. Dist. LEXIS 1332 (N.D.N.Y. Jan. 27, 2004), *aff'd*, 116 F. App'x 310 (2d Cir. 2004)).

Plaintiffs maintain that uniformity is not a legitimate government interest when there is no independent justification of a statutory classification; uniformity itself can be irrational, *e.g.*, prohibiting all animals from airports, including service animals. (Pls.' Opp'n Br. 4, ECF No. 68.) Additionally, Plaintiffs argue that the Statute decreased uniformity within the law because private religious cemeteries have historically been regulated differently than public cemeteries and are exempt from many provisions of the Cemetery Act. (*Id.* at 6.) Moreover, according to Plaintiffs, Defendants' cited cases do not support the proposition that uniformity is a government interest but instead indicate simply that cemeteries cannot engage in for-profit activities. (*Id.* at 5-6.)

Testimony from Mr. Beebe reflects that the Legislature actually considered this issue:

> It's the hat tricks of tax exemptions, exempt from property taxes, exempt from income taxes, and now exempt from the use taxes. This stunningly preferred economic advantage is exactly the reason that the New Jersey Supreme Court in *Frank versus Clover Leaf* and *Terwilliger versus Graceland* originally laid its prohibitory decisions on cemeteries, which were codified in the statute in 1971. In those two cases, the Supreme Court said that income and property tax exempt cemeteries had no intrinsic right to compete with taxpaying enterprises, and that a tax exemption was a privilege that had to be respected in its entirety. That its use

for competitive purposes place[s] the property rights of monument dealers and funeral homes at material risk. Unfortunately, neither the '71 Cemetery Act, nor the case law, directed themselves specifically to religious cemeteries. Because up until now they had not sought to operate outside of their traditional boundaries of providing places for the interment of the faithful. In the revision of the current Cemetery Act, in 2003, by the Law Revision Commission, in whose work I participated extensively, the omission of religious cemeteries from those explicit prohibitions imposed on nonreligious cemeteries was left intact because of a political understanding that, one, the revision effort was to maintain the status quo; and two, because religious cemeteries were not then engaging in the behavior that has now caused this matter to come before you.[14]

(Defs.' JSUMF ¶ 160.)

This is a straight forward matter, we believe, of extending a well-established public policy with regard to secular cemeteries to their religious counterparts to prevent religious cemeteries from commercializing their preferred, economic, and social position into a competitive advantage over the private tax-paying monument builders and funeral homes that serve their communities so well.[15]

(*Id.* ¶ 161.) At the time the Statute was passed, the Legislature considered that the Statute would apply a pre-existing rule that governs public cemeteries, to private religious ones and that the concerns animating this rule justified its extension. Moreover, then-Governor Christie acknowledged this rationale. Accordingly, the Court finds that this interest is at least "plausible [enough] to pass constitutional muster." *Heffner*, 745 F.3d at 79 (citing *Fritz*, 449 U.S. at 179).

---

[14] Plaintiffs do not object that the quotation reflects the testimony Mr. Beebe provided; however, they object "to the extent that Mr. Beebe's legal interpretation of New Jersey case law is shared by Plaintiffs, that he is trained to offer any legal interpretation of New Jersey case law, and that he can opine on the legislative history of the 1971 or 2003 Cemetery Acts, which Defendants acknowledge . . . lack any legislative history regarding the exemption of religious cemeteries." (Pls.' Resp. to Defs.' JSUMF ¶ 160.) These objections, for the purpose of the Court's analysis, are not material.

[15] Plaintiffs do not object that the quotation reflects the testimony Mr. Beebe provided; however, "Plaintiffs object to this statement to the extent that it asserts that there is such a thing as the 'separation of industries law' . . . or that A3840 was intended to 'prevent unfair competition.'" (*Id.* ¶ 161.) These objections, for the purpose of the Court's analysis, are not material.

## 2.    Regulating Tax-Exempt Entities

Defendants claim that the state has a legitimate interest in "regulating the manner in which the tax exemptions it grants are utilized" and that New Jersey case law supports the proposition that public cemeteries are charitable trusts and earning a private profit offends public policy. (Defs.' Moving Br. 24.)    Defendants note that the Legislature actually considered the tax exemptions at play when contemplating passage of the Statute and highlight the Senate testimony of Mr. Beebe and senators' comments.    (*Id.* at 24-25.)    Additionally, the state, according to Defendants, may treat non-profit entities differently from for profits to achieve legitimate state interests. (Defs.' Reply Br. 6.)

Plaintiffs claim that it is irrational for the Legislature to ban a non-profit from carrying out its mission in order to protect for-profit entities because forbidding a non-profit organization from "advancing its mission" contradicts the purpose of nonprofits and their tax-exempt status—these organizations provide value to society that is not motivated by economic gain.  (Pls.' Moving Br. 34.)    Plaintiffs argue that this Statute "opens the door" to legislative bans on nonprofits providing goods and services that are also provided by for profit enterprises. (*Id.* at 33.)  Plaintiffs also indicate that this Statute is unique; they cannot identify any other New Jersey statute that prohibits a nonprofit from "providing goods and services that are within . . . its mission." (*Id.* at 35.)  Plaintiffs further clarify that the Archdiocese is a non-profit entity and thus, the IRP does not generate any private profits. (Pls.' Opp'n Br. 9-10.)  Plaintiffs argue that the cases Defendants cite concerning the operation of public cemeteries by for-profit entities are, therefore, irrelevant.  (*Id.* at 10-11.)

The Court finds that the Legislature considered this issue:

Assemblyman Ciattarelli: . . . I do believe the tax-exempt status of the Archdiocese does inherently lower its costs and creates an unfair and unlevel playing field.

Senate Commerce Committee Chair Senator Gill: Since our current law does not allow a private, that is nonreligious cemetery owner, to open up a monument business, there is that distinction. The vertical integration, which is really a potential monopoly is extremely disturbing from an economic standpoint. . . . [I]t's also an economic issue to the monument builders, but they don't have a tax-exempt status that gives them an economic advantage, nor do they have the vertical integration that can result in a monopoly. So I think the issue of the seven percent use tax, the vertical integration that can produce a monopoly, and you can see that very clear. In fact, . . . for 160 years, the Church was fine with the way things went, and then there was an economic decision made that I think was cloaked in a religious argument, but that the inception of the argument was not religious, it was economic. So for those reasons, I will vote yes.

Assemblyman Moriarty: . . . [B]ut the dilemma we face is that I believe that the Catholic Archdiocese has an unfair advantage as a tax-exempt organization. And I think it's clear to me from the testimony. You may not agree with that, but that's my personal belief. But by passing this bill, we eliminate this competition entirely, and then we give all the advantage to the other side. So to me this is a – you know, there is – there are no easy answers."

Assemblyman Moriarty: I am voting yes, but you know reluctantly only because now we're . . . giving a monopoly to another group. I believe that this was an unfair advantage to a tax-exempt group. I think that they were able to come into the market and perhaps sell at a lower price, which is good for consumers, but if they put everybody else out of business, how long would it be before consumers would pay higher prices anyway[?]

(Defs.' JSUMF ¶ 162.) At the time the Statute was passed, the Legislature considered the effect of cemeteries' tax exemptions and controlled the manner in which the tax exemptions could be used. The Court finds it is "'at least debatable'" that the Statute "will tend to serve [this] legitimate public purpose." *Hancock Indus.*, 811 F.2d at 238 (quoting *Carolene Prod. Co.*, 304 U.S. at 154).

### 3. Consumer Protection

Defendants argue that the state has a legitimate interest in protecting consumers in the death care industry. (Defs.' Moving Br. 26.) They opine that the Third Circuit has recognized this interest, and consumers typically enter the funeral services market soon after the death of a loved one and are therefore likely to be vulnerable, emotional, and predisposed to exploitation. (*Id.*)

According to Defendants, the Legislature could have believed that the concerns that are reflected in New Jersey law governing public cemeteries also apply to religious cemeteries. (*Id.*) In fact, Defendants highlight that the Legislature actually considered that the Archdiocese has both a personal and spiritual relationship with parishioners and a well-trained, sophisticated, and monetarily incentivized salesforce engaged in marketing and outreach. (*Id.* at 26-27.) Defendants also contend that Plaintiffs misunderstand Defendants' consumer protection argument— Defendants do not argue that prevention of product tying is a state interest advanced by the Statute or that faith renders Catholics vulnerable. (Defs.' Opp'n Br. 29-30.) Defendants, however, state that the prevention of product tying (a sale of a good or service (*e.g.*, a headstone) conditioned upon the purchase of another good or service (*e.g.*, an interment right)) is a hypothetical legitimate state interest furthered by the Statute, in light of the concerns in the funeral industry. (*Id.* at 29.) In response to Plaintiff's argument regarding faith as a consumer protection concern, Defendants claim that identical public policy concerns implicated by secular cemeteries' sale of goods motivated the Legislature to pass the Statute. (*Id.* at 30.)

Plaintiffs argue that the Statute is not a consumer protection measure for three reasons. First, according to Plaintiffs, the Legislature cannot rationally ban the Archdiocese from selling monuments and vaults because: (i) no product tying actually occurred because participation in the IRP was optional; and (ii) the legislative response to funeral directors' actual product tying was much less drastic than the measure enacted here. (Pls.' Moving Br. 25-26.) Plaintiffs further assert that cemeteries are permitted to sell monuments in forty-seven states and there is no evidence of consumer harm. (*Id.*) Additionally, when the Federal Trade Commission and the State of New Jersey took action to address funeral directors' product tying of casket sales with other funeral goods, they banned product tying and required funeral directors to disclose that consumers may

purchase a casket from other vendors. (*Id.* at 27.) Thus, Plaintiffs contend that the rational legislative response to a product tying concern is to prohibit it, not to ban the sale of monuments and vaults; a legislature cannot rationally conclude that hypothetical product tying presents a more significant risk requiring stricter regulation than actual product tying. (*Id.* at 26-28.)

Second, Plaintiffs assert that the distinction between certain activities indoors and outdoors is irrational. (*Id.* at 29.) The Statute bans the Archdiocese's sale of monuments and vaults outside in a cemetery; however, it permits the sale of stone plaques and spaces in a wall that hold caskets in a community mausoleum—which, according to Plaintiffs, are the equivalents of monuments and vaults. (*Id.* at 29-30.) Plaintiffs assert that this distinction is irrational, arbitrary, and was simply drawn according to which products funeral directors and monument builders sell. (*Id.*)

Third, Plaintiffs contend that the final consumer protection concern is that parishioners' faith may render them vulnerable to exploitation; however, the Free Exercise Clause[16] prohibits Defendants from justifying the Statute in this manner on rational basis review. (*Id.* at 30-31.) According to Plaintiffs, the state cannot claim a legitimate interest in preventing expressions of faith. (*Id.* at 31-32.)

Finally, Plaintiffs allege that the Statute is not rationally related to consumer protection and instead, the distinction drawn is based upon whether a good or service is sold by a monument dealer or funeral director. (Pls.' Opp'n Br. 12.) Plaintiffs assert that there is no evidence of actual consumer harm and there is no evidence of product tying. (*Id.* at 12-13.) It is not rational, according to Plaintiffs, that the Archdiocese is considered trustworthy enough to sell a $40,000 community mausoleum space without regulation but cannot sell monuments for use outdoors. (*Id.*

---

[16] Plaintiffs do not assert a claim under the Free Exercise Clause to deal in monuments or vaults. (Pls.' Moving Br. 32.)

at 14.)

The Court finds that the Legislature actually considered that consumers in the death care industry may be vulnerable:

> Assemblyman Diegnan: I deal with some of this in my practice, these are the times when people are most vulnerable, most vulnerable to making bad decisions. You know, they feel guilty about grandma or grandpa. And . . . to make that decision at the time that they purchase the plot is, in and of itself, to me . . . just bad practice.[17]

(Defs.' JSUMF ¶ 168.) Moreover, the Third Circuit recognized that the state "has a legitimate interest in protecting consumers who must venture into the potentially exploitative market for funeral services." *Heffner*, 745 F.3d at 83. Accordingly, in light of the existing legislative scheme and record at the time the Statute was enacted, "facts existed that demonstrated to the [L]egislature that such a law was necessary to . . . protect the state's citizens when they are making important and difficult decisions regarding the burial of loved ones." *N.Y. State Ass'n of Cemeteries*, 2004 U.S. Dist. LEXIS 1332, at *26-27.

Finally, the Statute "at least debatabl[y]" tends to serve the legitimate public purposes discussed above. *Hancock*, 811 F.2d at 238 (citing *Carolene Prod. Co.*, 304 U.S. at 154). "[T]here is no need for mathematical precision in the fit between justification and means" when a Court examines economic legislation under rational basis review. *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 639 (1993). Here, Defendants have identified multiple state interests and explained how the Statute's prohibitions reasonably function to minimize harm. In addition, the parties largely subsume their Equal Protection analysis within the Due Process arguments. The Court finds that even assuming *arguendo* that vaults and crypts

---

[17] Plaintiffs object to the generalization made by Defendants and Assemblyman Diegnan that purchasers of funeral services, burial plots, and monuments are "vulnerable consumers." (Pls.' Resp. to Defs.' JSUMF ¶ 168.)

and plaques and monuments are functionally equivalent, the Legislature's classification is rationally related to the legitimate state interests set forth above. Further assuming for the purposes of argument that consumer protection concerns may exist in the sale of both groups of items, Plaintiffs have not demonstrated a violation of Equal Protection Clause. "Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by [the legislature] imperfect, it is nevertheless the rule that . . . perfection is by no means required." *Vance v. Bradley*, 440 U.S. 93, 108 (1979). Moreover, the Legislature was entitled to address a perceived problem incrementally. *See Beach Commc'ns*, 508 U.S. at 316; *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955). Accordingly, the Statute withstands constitutional scrutiny.

## IV.  **CONCLUSION**

Accordingly, for the reasons set forth above, Plaintiffs' motion for summary judgment (ECF No. 67) is DENIED and Defendants' joint motion for summary judgment (ECF No. 66) is GRANTED. An order consistent with this Memorandum Opinion will be entered.


*Mashipp*
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE


Date: February 23, 2018